1  MORGAN, LEWIS & BOCKIUS LLP
2  BARBARA J. MILLER, State Bar No. 167223
   barbara.miller@morganlewis.com
3  JENNIFER L. BRADFORD, State Bar No. 203871
   jbradford@morganlewis.com
4  MARIA D. O'LEARY (SBN 209995)
   maria.gutierrez@morganlewis.com
5
6  SARAH N. DRECHSLER, State Bar No. 223820
   sdrechsler@morganlewis.com
7  5 Park Plaza, Suite 1750
   Irvine, CA  92614
8  Tel:  949.399.7000/ Fax:  949.399.7001
9
10 Attorneys for Defendant
   BEST BUY STORES, L.P.
11
                    UNITED STATES DISTRICT COURT
12
                  CENTRAL DISTRICT OF CALIFORNIA
13

14 TIM CAMPBELL, individually, and on          Case No.:  CV-12-07794 JAK (SH)
   behalf of members of the general public
15 similarly situated,
16                                             **DEFENDANT BEST BUY STORES,**
                 Plaintiff,                    **L.P.'S OPPOSITION TO MOTION**
17                                             **TO STRIKE DEFENDANT'S**
          vs.                                  **DECLARANTS OFFERED IN**
18                                             **SUPPORT OF OPPOSITION TO**
   BEST BUY STORES, L.P., a Virginia          **MOTION FOR CLASS**
19 Limited Partnership; and DOES 1            **CERTIFICATION**
   through 100, inclusive,
20
                 Defendants.                   Date:     September 9, 2013
21                                             Time:     8:30 a.m.
22                                             Ctrm:     750
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .............................................................................. 1

II. CORPORATE DECLARATIONS ................................................... 1

III. PUTATIVE CLASS MEMBER DECLARATIONS ...................... 2

    A. Putative Class Members Were Provided Appropriate Information ........................................................................... 3

    B. Putative Class Members Confirmed their Declaration Statements ...... 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bell. v. Addus Healthcare*
    2007 WL 2752893 (W.D. Wash 2007) ........................................................... 7

*Casida v. Sears Holding Corp.*
    2012 U.S. Dist. LEXIS 111599 at*7-8 (E. D. Cal. 2012) ........................... 7

*Castaneda v. Burger King Corp.*
    2009 WL 2382688 (N.D. Cal. 2009) ............................................................. 7

*Pedroza v. PetSmart, Inc.*
    2013 U.S. Dist. Lexis 53794 (E. D. Cal 2012) ........................................... 7

*Roselaes v. El Rancho Farms*
    2011 U.S. Distr. LEXIS 142772 (E.D. Cal. 2011) ...................................... 7

*Yingling v. eBay, Inc.*
    2010 WL 2382304 (N.D. Cal. 2010) ............................................................. 7

## I.    <u>INTRODUCTION</u>

Plaintiff's Motion to Strike ("Motion") extensively misconstrues the declaration and deposition testimony of the witnesses whose testimony was offered with Defendant's Opposition to Plaintiff's Motion for Class Certification.  First, the corporate declarations offered by Defendant establish foundation and personal knowledge to testify about the policies and procedures discussed, as they apply to Best Buy ("BB") throughout the organization, including California.  Second, the testimony both of the putative class members ("PCMs") and BB's attorney's confirm that, before PCMs were interviewed by BB's lawyers or gave statements, they were told about the nature of the lawsuit, that the BB lawyer did not represent them, that their interests could be opposed to those of BB in the lawsuit, that their statements would be used to defendant BB in this matter, that their participation in the interview and declaration process was entirely voluntary, and that nothing bad would follow if they elected not to participate. Further the declarations were carefully read line by line to each PCM by BB's attorneys, the PCMs had the opportunity to and did change statement language, PCMs were asked to carefully read the statements themselves and let the BB attorney know if additional changes were needed.  Third, as demonstrated by the response to the alleged discrepancies between declaration and deposition testimony, PCMs largely confirmed the material substance of their statements. Moreover, most alleged discrepancy results from Plaintiff's mischaracterization of substantive testimony.  Regardless, any actual discrepancy goes to the weight not the admissibility of the declaration.  Finally, to the extent that the witnesses wish to withdraw their declarations or discontinue their participation from this process, they wish to do so because of the extreme mistreatment and threats to which the Plaintiff's attorneys have subjected them as described more fully in BB's proposed sur-reply [DKT No 58-1]. Accordingly, Plaintiff's Motion to Strike is without merit and must be denied.

## II.   <u>CORPORATE DECLARATIONS</u>

Plaintiff's motion to strike the corporate declarations is spurious.  Each declaration states clearly on its face that the witness has knowledge of the policies and procedures

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

DB2/ 24304600.1

1

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

1   about which each is testifying.  Plaintiff's counsel's contention that the witnesses must

2   say that the witness has specific knowledge of policies in California when the witness has

3   stated that he or she has knowledge of such policies throughout the entire organization in

4   all geographies is wrong.  Further, to the extent that Plaintiff's counsel wished to obtain

5   more information from witnesses who had not been deposed, Defendant offered to

6   coordinate the depositions and Plaintiff declined that offer.  Drechsler Decl. ¶ 14, Exh. 2.

7   For these reasons, Plaintiff's motion must be denied.

8   **III.   <u>PUTATIVE CLASS MEMBER DECLARATIONS</u>[1]**

9         Plaintiff's Motion with respect to PCM declarations fails for several reasons.  First,

10  each PCM who provided a statement was told both at their initial interview and in their

11  declaration review interview that their participation was completely voluntary, and they

12  chose to participate in the interview.[2]  Indeed, since the initial interview took place via

13  telephone, a PCM could decline to participate simply by not answering his/her telephone.

14  Second, BB lawyers provided each PCM extensive disclosures about the nature of the

15  lawsuit including the fact that they might be members of the class, that their interests were

16  opposed to BB, and that the interviewing attorney did not represent them.  Third, during a

17  separate follow-up interaction which took place by telephone or in person with each

18  potential declarant, the BB attorney conducting the interview read the draft statement

19  _____

20  [1] Plaintiff foundation merit is spurious.  Not only is their membership in the putative
    class evident from the face of the declarations but Plaintiff's counsel is well aware from

21  discovery and deposition testimony of the declarants home address and work location

22  both being in California.   Likewise, Plaintiff's contentions regarding inability to serve
    declarants with process is without merit.  As discussed at length in Defendant's Motion

23  for a Protective Order [DKT No. 43], Defendant offered to assist in coordinating
    deposition dates and times but Plaintiff's counsel refused this offer.  Further, Mr.

24  Clark's declaration stated that Mr. Clark lived in Mexico and works in the United

25  States.  To Defendant's knowledge, Mr. Tran does not and has never lived in Mexico;
    Defendant has never informed Plaintiff's counsel that he did.

26  [2] Where a putative class member requested not to be involved in the case further, BB

27  attorney discontinued the interview and declaration gathering process at that point. See
    Drechsler Decl. ¶ 13, Exh. 2 attaching Velagic declaration with handwritten notes.

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

DB2/ 24304600.1          2          OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

1   based on the initial interview line-by-line and gave the declarant abundant opportunity to

2   make revisions and corrections.  Finally, most of the so-called contradictions between

3   declaration and deposition testimony are not in fact contractions but rather cherry-picked

4   and often miscited portions of deposition testimony.  As described in Defendant's

5   proposed  Surreply, from the outset, Plaintiff employed a purposeful strategy of

6   intimidating and coercing PCMs into stating that they wanted their declarations

7   withdrawn.  This campaign started with subpoening PCMs for depositions in very tight

8   time frames at locations requiring many more than 100 miles round trip, and then telling

9   PCMs that they could avoid depositions by telling BB's counsel that they wanted

10  declarations withdrawn.  *See e.g.* Drechsler Dec., ¶ 15.  They refused to reschedule

11  depositions, even when deponents requested such rescheduling.  *Id.* at 17; [Dkt #43,

12  Def'ts Motion for a Protective Order].  At depositions, they told witnesses that they could

13  have avoided the deposition by withdrawing their declaration and that it was the statement

14  that "forced you to come in . . . and now be subject to these proceedings."  *See e.g.* Hang

15  Dep. 40:10- 42:21.  The deponents were subjected to threats of prison for perjury,

16  intrusion into their personal financial circumstances, suggestion that they were

17  jeopardizing their family's financial stability by participating in this litigation, contorted

18  leading and misleading question, and aggressive and repetitious questions  -- sometimes

19  for pages and pages of the deposition transcript – until the witness acceded to the

20  admission Plaintiff's counsel wanted.  For all of these reasons, Plaintiff's motion is

21  without merit.

22        **A.    Putative Class Members Were Provided Appropriate Information**

23        Each of the putative class members whose declaration was submitted with BB's

24  Class Certification Opposition to the Motion for Class Certification was initially

25  interviewed by one of BB's attorneys to obtain facts.  At the beginning of the interview

26  the attorney read to each of these declarants the following statement:

27        A lawsuit has been brought against Best Buy by Tim Campbell, one of its
        former In-Home Appliance Repair Technicians.  In the lawsuit, the

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1                                     3                    OPPOSITION TO MOTION TO STRIKE
                                                                        CASE NO. CV-12-07794 JAK (SH)

plaintiff alleges that he was not properly compensated.  The plaintiff also claims that he was not provided meal breaks and rest breaks.

The plaintiff is seeking to bring his claims as a class action against Best Buy on behalf of all current and former employees who worked for Best Buy in California as In-Home Appliance Repair Technicians, In-Home Consumer Electronics Repair Technicians, and In-Home Appliance and Consumer Electronics Repair Technicians from March 23, 2008 through the present.  Right now, the lawsuit is just an individual one by the former employee.  However, the Court may, in the future, approve this lawsuit as a class action in which case you could become a member of the class.  If you become a member of the class, you would be on the other side of the lawsuit against Best Buy.

I am an attorney who represents Best Buy only.  I do not represent you.  I am interviewing various In-Home Repair employees to gather facts so that Best Buy can decide how best to respond to the lawsuit.  The information you provide may be used in connection with the lawsuit and may be used in Best Buy's defense of the lawsuit.

This interview is voluntary.  You do not need to speak with me.  If you choose not to speak with me, no negative consequences will follow.

The attorney then asked each interviewee if he/she was willing to be interviewed and each responded yes.  Likewise, at the end of the deposition, the interviewee was asked if they would be willing to have a statement prepared outlining the information conveyed during the interview.  They were told that providing statements was completely voluntary.   Drechsler Decl. ¶¶ 7-8; Fisher Decl ¶¶ 4-6; Grodan Decl. ¶¶ 4-9.

BB then drafted statements based on the facts provided during the interview as to some of the PCMs.  BB then set up either time for a telephone follow-up or an in-person follow-up to finalize the statements.  Each PCM could have declined to participate at this stage by not taking the telephone call or attending the in-person interview.  During the appointment (telephonic or in-person) to go over the declaration, the BB attorney told the PCM that they were going to review the declaration and make any changes necessary.  The attorney read the entire statement to the PCM carefully including the paragraph of the declaration that re-stated the disclosures about the witness's interest being opposed to the company and about the statement being entirely voluntary.  As the attorney read the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

4

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

1   draft statement, details and changes were made.  *See e.g.* Soto Dep. 56:11-58:10.[3]   If this

2   interview was telephonic, the attorney read the entire statement and made revisions until

3   correct and then mailed it to the PCM to review and sign with a cover letter reiterating

4   that signing the declaration was voluntary and that the employee should review the

5   declaration before signing it.  Dreschler Decl. ¶¶ 10-12; Fisher Decl. ¶¶11-13, Exh. 1;

6   Grodan Decl. ¶¶ 11-13, Exhs. A & B.  The PCM could have elected not to sign or return

7   the statement.   At in-person meetings, PCMs had abundant opportunity to read and

8   confirm the statement and ask questions before signing.  *Id.*; Soto Dep. 185:11-186:4

9   (Soto believed that he could have refused to sign the statement).

10          Indeed, the declarants generally confirmed that they were informed that they

11   process was voluntary.  For example, Mr. Hui, who suffered some of the most harassing

12   treatment by Plaintiff's counsel, confirmed that he received an explanation of the lawsuit

13   from the BB attorney who met with him, was told that the attorney represented BB only,

14   told that he did not need speak with the attorney, and answered the attorney's questions

15   honestly.  Hui Dep.163:19-23, 164:15-165:11, 165:16-166:1.  Before he signed his

16   statement, the BB attorney read the entire declaration through to him and he took an

17   additional ten minutes to read through the declaration on his own.  *Id.* at 168:10-15.

18   PCMs likewise confirmed that the attorney read the entire statement to them and/or the

19   witness read it himself.   Alexander Dep 129:23-130:11; Cabrera Dep. 220:1-20, 221:16-

20   24, 241:25-242:23; Daley Dep. 41:15-42:5; Dumpit Dep. 58:15-58:8, 60:2-7; Mamola

21   Depo. 93: 12-16; Peterson Depo. 108:12-16 (read declaration to be sure it was accurate

22   before he signed it), 143:4-7 ("the facts are accurate to what I said");  Soto Depo. 56:11-

23   18, 57:1-8, 58:7-10 (made corrections as the attorney read the statement);  Telles Depo. at

24   234:4-10, 248:2-23 (confirming that the statement was read to him, he was specifically

25

26   [3] Soto did not testify that he would sign anything to keep his job; this testimony does
    not exist.  He said, "not anything" when asked if he would sign anything.  He was never

27   asked if he would sign something that was false.  Soto  Dep. 59:14-25.  And he said

28   absolutely nothing about keeping his job.

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

DB2/ 24304600.1                                5                    OPPOSITION TO MOTION TO STRIKE
                                                                    CASE NO. CV-12-07794 JAK (SH)

1  asked if there were any changes he needed to make, and that he confirmed to the attorney

2  that the statements in his declaration were accurate); K. Tran Dep. 32: 1-4, 167:8-14;

3  Zook Dep. 203:12-24.  They testified that the BB attorney told them about the lawsuit.

4  Alexander Dep.122:22-123:5, 125:3-128:25("he told me I could opt out of it there, I

5  didn't have to answer any questions, and that, yeah, potentially I could be on the other

6  side);  Cabrera Dep. 230:2-14, 244:20-24 (declaration would be filed in court and

7  probably would be called for a deposition); 245:18-22; 251:17-252:16 (understood that

8  giving his statement could affect his participation in the lawsuit because he couldn't give

9  one statement to Morgan Lewis and a different one to someone else); Soto Depo. 181:2-

10  18, 186:17-187:8; Hang Dep. 33:2-10 (could have asked questions about the class action

11  and wasn't being "pushed" by the attorney), 33:23-35:24, 38:13-39:10; Van Tran 169:16-

12  24; Zook 39:1-40:7.  And PCMs confirmed their supervisors and/or the attorney informed

13  them that participating in the interview and submitting the statement was voluntary.

14  Alexander Depo. 122:22-123:5, 125:3-128:25; Cabrera Depo. 239:3-16, 241: 18-24,

15  250:11-251:14 (it was his "free will" to give declaration); Dumpit 69:1-3;, 235:5-16;

16  Hang Depo. 31:7-19; Mamola 67:6-16; Soto Depo.  181:21-182:11, 185:11-4, 186:2-4;

17  Peterson Depo. 95:7-96:10 ("I agreed to do it because it was something that I believed in.

18  He didn't ask me in a way that was mandated or forceful.  He just asked me if I would be

19  willing to."); Telles Depo. 28:5-12, 77:23-25; Van Tran Depo. 32: 13-24, 42:18-43:18;

20  Zook Depo. 15:24-16:4, 25:1-7, 26:7-27:6.

　　　In some instances, PCMs testified that the attorney may have given them more
information about the lawsuit or about the declaration and interview process, but they
could not remember exactly what the attorney interviewing them had said to them.
Alexander 129:2-9; Cabrera 288:1-289:9; Daley 19:16-20:2, 26:20-27:20; Mamola Depo.
176:21-177:9; Telles 73:14-16; Van Tran 170:7-172:14; Zook 44:5-21, 204:25-206:1.

　　　Some PCMs expressed a desire to withdraw statements after the harassment by
Plaintiff's counsel in deposition, and the suggestion that withdrawing the declaration
would keep them from needing to appear in court.  (See Proposed Sur-reply at 2.)  *See*

1   *also* Telles 80:23-81:4 (would have preferred not to be involved in the lawsuit so he

2   would not have had to go to Lancaster for two days); Van Tran 44:4-45:10 (decided that

3   he no longer wanted to be involved when he was subpoenaed); Hang Dep. 40:10-43:20.

4         In sum, the disclosures provided by Defendant's attorneys fully complied with the

5   appropriate disclosures to putative class members by a Defendant's attorneys. *See, e.g.*,

6   *Bell. v. Addus Healthcare*, 2007 WL 2752893 at * 1-2 (W.D. Wash 2007); *Castaneda v.*

7   *Burger King Corp.*, 2009 WL 2382688 at *5-8 (N.D. Cal. 2009); *Yingling v. eBay, Inc.*,

8   2010 WL 2382304 *2-3 (N.D. Cal. 2010)

9         **B.     Putative Class Members Confirmed their Declaration Statements**

10        Plaintiff's contention that PCMs have recanted grossly mischaracterizes testimony

11  often given after extensive leading and misleading questions and word play by plaintiff's

12  counsel on cross examination. *See* Proposed Sur-reply at 2:7-3:14, 5:26-7:24.

13  Regardless, discrepancies between depositions and declarations do not render

14  declarations inadmissible or serve as a basis for a motion to strike.  Rather, they go the

15  weight that a court should accord the evidence. *See Roselaes v. El Rancho Farms*, 2011

16  U.S. Distr. LEXIS 142772 *21 (E.D. Cal. 2011) ("Regardless of any alleged

17  contradictions in the evidence, this is not an issue of admissibility, but rather an argument

18  as to the proper weight to be given to the evidence.") (emphasis in original).  *See also*

19  *Pedroza v. PetSmart, Inc.*, 2013 U.S. Dist. Lexis 53794 at *6 (E. D. Cal 2012)(holding

20  that where there are alleged inconsistencies between putative class member depositions

21  and declarations submitted in connection with a certification motion "go to the weight of

22  the declarations, not their admissibility").  Further, courts have held that evidence

23  considered on a motion for class certification need not satisfy the standards to be

24  admissible at trial. *See e.g.*,  *Casida v. Sears Holding Corp.*, 2012 U.S. Dist. LEXIS

25  111599 at*7-8 (E. D. Cal. 2012).

26                              **Darren Alexander**

| **Declaration** | **Purported Contradicting Evidence** |
|---|---|

| Alexander Dec. ¶ 7 , 3:5–6 "I was always paid for my drive time home." | PAE070, Alexander 225:7–12 |
|---|---|

**RESPONSE:** Alexander testified that he listed his drive time home in the "complete route and send" portion of the route sheet and was paid for his time. Alexander Dep. 151:11-161:10 Plaintiff's counsel found one example in his route sheets where he made a mistake in calculating his drive time wrong and wrote down ten minutes instead of fifteen minutes resulting five minutes of unpaid drive time in his entire employment. *Id.* at 223:4-225:15 ("I screwed the math . . . I did the math wrong . . . It looks like I missed out on five minutes.") This one math mistake does not invalidate Alexander's statement that he was paid for his drive time home because he recorded it in "Complete Route and Send."

| Alexander Dec. ¶ 8,3:17–18 "I know Best Buy prohibits its employees from working off the clock. The company is very clear about this policy." | Alexander testified that BB actual policy was to require his meal breaks recorded but that BB does not actually care when if he is able to take a meal break within the first 5 hours of his shift. PAE065–066, Alexander 214:11–215:1 |
|---|---|

**RESPONSE:** Alexander clearly, and in response to repeated questions misstating his prior answers, testified that the company told him that he could not work off the clock including during lunch breaks. *See e.g.*, 219:3- 222:20;  220:10-11("When they tell us we can't work off the clock, they also encompass the lunch break.").  He stated that he does not always put the exact time that he takes his lunch on his route sheet but confirms that he does take his always take his 30 minute lunch break and that Best Buy gives him leeway as to when in that 5 hours to take it so long as his takes it. *Id.* at 213:9-216:7.

| Alexander Dec. ¶ 8 3:24–25 "I have always recorded all the time that I worked." | PAE070–071, Alexander 225:20–226:17; PAE055–56, PAE069–070, Alexander 169: 6–16; 181:6–13; 224:5–12; 225:4–12. |
|---|---|

**RESPONSE:** Alexander rounds his route sheet time to the nearest 5 minutes rather than recording it "minute for minute." Alexander Dep., 211:8-25 ("Every time ends in a zero or a five.  The call didn't end always at 10:10 or 12:50.  It can end at 12:51, whatever.  I just round my times."); 225:20 -226:5.  For example, a lunch break that started at 11:22 or 11:23, he would round down to starting at 11:20. *Id.* at 145:14-25.  Rounding does not dispute

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

8

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

| | |
|---|---|
| Alexander's statement that he records the time he works. | |
| Alexander Dec. ¶ 9, 3:26–4:6 "I believe my **TLC records are accurate**…I always tried to be accurate as to the start and stop time for the day and the time that I took my meal break… I believe that I have been compensated for all of the hours that I worked." | Evidence shows that Alexander did not properly record his time, worked through meal breaks, and was not paid for all time worked. Alexander Decl. ¶ 8 (3:9–15); PAE055–56, PAE069–070, Alexander 169:6–16; 181:6–13; 224:5–12; 225:4–12; PAE064, PAE051–054, Alexander 212:13– 25, 145:5–147:24, 148:2– 5, 148:22–25 PAE070–071, Alexander 225:20–226:17 |

**RESPONSE:**  The statement challenged relates to *TLC timekeeping,* which is entirely separate from route sheets.  TLC went into effect in October of 2010, long after FMS went into effect. Techs clock in/out of TLC in real time. After TLC, the route sheet is not a timekeeping device.  Alexander was not asked about his TLC practices, nor did he remotely suggest that he clocked in/out of TLC inaccurately.  Thus, nothing in his deposition conflicted with the declaration statement at issue.  In his *declaration*, Alexander accurately stated that "several years ago", before FMS (before TLC) he sometimes worked time he did not record "because he felt that [he] was cheating the company. . . [because he] got lazy." Dkt 36-1, pg 4 of 106.   The statement has nothing to do with TLC timekeeping.  During his deposition, Alexander repeatedly testified that he rounded his time – including the times at the Justice – to the nearest five minutes. Alexander Dep. 145:14-25.  Alexander did not state that he worked or drove through meal times.  Indeed, he testified that he always took a 30-minute lunch, but did not always record his times on his route sheet to the minute and did not always record the meal period when he took it.  *Id.* at 38:10-39:24; 213:1-216:7.  Thus, a route sheet showing that a meal period ending when a call began was insignificant, because he would estimate both when he ended a meal and when he started at the customer. *Id. at* 213:1-216:7.   Indeed, Alexander testified that his TLC records would most accurately show when he actually took a lunch; not his route sheet.  *Id.* at 210:15-211:17.

| | |
|---|---|
| Alexander Dec. ¶ 11, 4:16–20 "I may receive one to two call a week during my meal break but I do not answer the call… I have never | PAE032, Alexander 12:15–25 [picks up the phone anytime it rings throughout the day]. PAE042, PAE045–046, Alexander 79:2–4; |

| been told or felt pressured to answer my phone when I am not clocked in." | 84:4–85 |
|---|---|

**RESPONSE:** The cited testimony at page 12 (PAE032) has nothing to do with phone calls; the testimony relates to whether Alexander is represented by counsel. Plaintiff then deliberately takes out of context and misconstrues the remaining cited testimony regarding phone calls; in the cited testimony, he said he keeps his phone on, not that he answers it. In fact, he testified that he does not answer work-related phone calls on when he is on break:

> Q: You've never experienced your lunch break being interrupted by, let's say, a phone call; right? The Witness: well, the phone rings all the time during lunch. I don't pick it up unless it's one of the other guys.
> Q: What do you mean?
> A. Another technician.
> Q. So if another technician called you, you would pick it up?
> The Witness: yeah.
> Q. Why would you pick up another technician's call?
> A. Because they want to b.s.
> Q. Because they want to b.s.?
> A. That's why they call.
> Q. So they want to talk about work; right?
> A. Yeah.
> The witness: Not talk about work. We're just talking.
> By Ms. Szeto:
> Q. Shoot the breeze?
> A. Basically, yeah

Alexander Dep., 200:18-219:20 (objections omitted)

| Alexander Dec. ¶ 12, 4:21–27 "I know Best Buy's policy provides me with a 30-minute meal period before the fifth hour of my shift…my mangers have regularly reminded me that I have to take a 30-minute meal break before the fifth hour of my shift." | Alexander recanted ¶ 12 of his declaration stating that they did not in fact "regularly remind me." PAE067–068. Alexander 217:8–218:17. Further, Alexander stated that Best Buy only cares that the meal breaks appear to be taken, but encourage Techs to work or drive through their breaks. PAE065–066, Alexander 214:11–215:1   Alexander testified that Best Buy disciplined him for reporting a lunch taken after his 5th hour, even though "if you try to follow the F.M.S. guidelines…you'll miss your lunch break." PAE036–037, PAE063, Alexander 40:21–41:1, 210:5–13. |
|---|---|

**RESPONSE:** Alexander never testified that he was encouraged to work through meal breaks or that he recorded breaks that he did not take. Instead, he confirmed that he was

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

10

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

reminded at least annually of BB policies that employees must not work off-the-clock, including off the clock during meal periods.  Alexander Dep. 219:3-222:20. He confirmed that he takes a 30-minute meal break within the first five hours of work.  He does not always record the break at the precise time he took it, but he does <u>not</u> record meal periods as occurring during the first five hours of work without actually taking a meal period within the first five hours of work.  *Id.* at 213:1-216:216:7.

### ii. Luis Armando Cabrera

| Declaration | Alleged Contradicting Evidence |
| --- | --- |
| Cabrera Dec. ¶ 7, 2:22–23 "I am not supposed to perform any work while off the clock according to Best Buy's policies." | PAE089–096, Cabrera 148:11–154:11, 158:12–25 |

**RESPONSE:**  The cited deposition testimony has nothing to do with off-the-clock work. Plaintiff testified that his drive time home was paid, even if his route sheet indicated he was not.   Nothing exists to dispute the identified declaration statement.

| | |
| --- | --- |
| Cabrera Dec. ¶ 9, 3:10–12 "If I do happen to receive a call during my break I may or may not choose to answer the call. I know that I am not required to answer the phone or to review emails during my breaks." | PAE099, Cabrera 214:6–13 [only after his shift is over is he allowed to choose not answer calls] |

**RESPONSE:**  Cabrera never testified that the was forced to answer his phone during breaks; indeed he repeatedly testified that he had the choice to answer the phone during breaks despite counsel's harassment and intimidation:

Q.· ·You understand that you were given a company-issued cell phone, right?
A.· ·That the company is giving me a phone?· Yes.
Q.· ·And that you use that phone for company purposes only?
THE WITNESS:· We haven't been really told we cannot call anybody, and I have used it for personal use --
BY MR. HAN:
Q.· ·I see.
A.· ·-- when I'm working.
Q.· ·And you understand that we can get your phone records to track exactly who you called at what time, right?
A.· ·Yes.
THE WITNESS:· I would say yes.
BY MR. HAN:
Q.· ·And if we were to the check the phone records and see that during your lunch breaks that you made phone calls to your supervisor, you would be telling a lie --
BY MR. HAN:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1                                        11                   OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

Q.· ·The phone calls you made during your lunch breaks, were any of them to your supervisors?

THE WITNESS:· No.

BY MR. HAN:

Q.· ·Is that like a no or is it --

A.· ·No, no.

Q.· ·The phone calls you received from your supervisor -- I'm sorry.· The phone calls that you received during your lunch breaks, were any of them from your supervisors?

THE WITNESS:· I would say very few.

BY MR. HAN:

Q.· ·But there have been some?

THE WITNESS:· It could happen.

BY MR. HAN:

…

Q.· ·And whether you reported that time as time that you worked through your lunch break, your supervisor should have known that, right?

THE WITNESS:· He probably does not even know it was a break or not

…

Q.· ·Yet you were not paid for an hour additional pay, right?

THE WITNESS:· *No because I chose to answer.*

BY MR. HAN:

Q.· ·Let me ask you this, sir.· Before your deposition today who told you to answer that you chose to do work through your lunch and work through your breaks?

THE WITNESS:· Nobody ever told me I had to do it or I don't have to do it.

BY MR. HAN:

 Q.· ·Who coached you to -- who prepared you for this deposition?

THE WITNESS:· Which deposition?

BY MR. HAN:

Q.· ·The deposition we're in right now, who prepared you?

THE WITNESS:· Nobody.

THE WITNESS:· Nobody has given you testimony. You asked me, and I just answered to you.

Cabrera Dep. 270:13- 275:8 (objections omitted).

| James C. Daley | |
|---|---|
| **Declaration** | **Alleged Contradicting Evidence** |
| Daley Dec. ¶ 6, 2:13 "I always take my  30-minute lunch break" | Contradicting evidence demonstrates that Daley has no credibility. PAE126, PAE133-143, Daley 37:12–24, 155:17– 165:15 |

**RESPONSE:**  Daley repeatedly testified that he took his meal breaks.  Daley Dep. 130:23-134:6 ("I take my lunch break before the five hours . . . I don't work after I'm supposed to work, and I take all my lunch breaks before five hours, and I don't drive on my lunch breaks . . . I just rounded up the numbers.  That's why is it looks stupid.  I'm sorry about that."); 145:10-19, 146:20-147:13.  He testified that, "I never drive during my lunch break." *Id.* at

145:10-11.  He also told counsel that he rounded his time entries through the day to the nearest five minutes because doing so made recording his time easier for him.  *Id.* at 138:8-22.  He confirmed that his route sheets are "reflecting accurate times within five minutes.  I just round up my numbers.  I told you.  And I'll tell you again; I round up my numbers."  *Id.* at 146:6-10.   He explained that the rounding throughout the day could result in all of his drive time not being separately reflected.  *Id.* at 146:8-147:13; 136:5-16.  138:7-146:10.  *See also* 148:18-23 ("When it comes to the lunch part, my answer's the same every time.· I just round up my numbers.· I always take my lunch on time.· And that's all I have to say.· That's what I am going to keep telling you over and over again, because that's what I do."); 150:8-16 ("Take my lunch on time all the time.· And I round up my numbers, and that's why it looks funny.· If I'm guilty of anything here, it's trying to be efficient when I fill out stuff, but that's it.· I take -- I don't ever drive on my lunch.· I don't -- I take my lunch before the time I have to take.· I'll tell you same thing over and over again, because it's the truth.  That's what I do.· I just round my numbers, so it looks funny.· I round my numbers.· That's it."); 151:20-152:3 (" I don't know what Best Buy is supposed to do or not supposed to do, but they don't have to pay me anything because I didn't drive on my lunch break.· Although I rounded up my numbers . . . but I don't ever drive on my lunch break.· So they don't need to pay me anything, and I'm testifying to that right now.· They didn't do anything wrong. . . . I'm wrong in this situation, not them.")  He continued to confirm that he didn't drive during his lunch when counsel argued with him using a google map distance calculator that it should take him 9 minutes rather than five minutes to drive between two locations on his route sheets.  *Id.* at 159:6-161:25.  Mr. Daley expressed frustration with counsel's harassing attempts to misstate his answers and goad him into changing his testimony particularly when he was forced by Plaintiff's counsel to fly to California for the deposition when he had been with his father who was hospitalized on the East Coast.  *Id.* at 165:18-22 ("No.· I've answered your questions.· I don't want to answer them anymore.· This is ridiculous.· I told you, I'm tired.· I had a long flight.· My dad was in the hospital.· I don't have any more patience for this.")  These excerpts do not reflect Mr. Daley's unreliability , but rather

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

13

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

Plaintiff's counsel's inadequacy to serve as his counsel.

| Daley Dec. ¶ 8 [does not have to answer calls during meal breaks.] | PAE128–129, Daley 46:20–47:13 [has to have his phone on at all times during working hours, including meal and rest breaks.]. |

**RESPONSE:**  Neither in the cited testimony nor anywhere else does Mr. Daley testify that he was required to leave his cell phone on during meal and rest breaks or answer his phone during meal or rest breaks.  The cited testimony is "To the best of my knowledge, I imagine *during work hours,*  I'm supposed to have my cell phone on.  That makes sense, anyway." Meal breaks are not work hours.  Moreover, the cited testimony has nothing to do with whether Daley ever answered his phone on meal or rest breaks.  Counsel never asked Daley whether he answered his phone during meal and/or rest breaks.

**Jerry Dumpit**

| Declaration | Alleged Contradicting Evidence |
|---|---|
| Dumpit ¶ 4, 1:26–26 "I always recorded my start and end times as well as my meal period accurately." | Dumpit testified that his meal breaks were not in fact accurate because he spends 10 minutes of his lunch break driving to his next appointment without recording the time each day. PAE160, Dumpit 192:9– 14. |

**RESPONSE:**  Dumpit testified that occasionally he takes 35 minutes for lunch and up to 10 minutes to travel.  Dumpit Dep. 191:18-192:25.

| Dumpit ¶ 5 [Prep process takes 15-30 minutes] | PAE 155, Dumpit 129:10–24 [prep actually takes 30-60 minutes.] |

**RESPONSE:**  Dumpit testified that it took about 30 minutes to complete his morning activities and confirmed that BB never told him that the prep time had to take 30 minutes or less.  Dumpit Dep.128:19-132:8.

| Dumpit ¶ 6, 2:20–21  "I have always been paid for my travel time home." | Dumpit expressly testified that this section of his declaration was incorrect. PAE163– 164, PAE166– 167, Dumpit 220:21–221:7, 224:16–225:3 |

**RESPONSE:**  Dumpit testified that he put his drive time home in a compensable area of the route sheet.  Dumpit Dep. 174:13-175:17.  He assumed he was paid for drive time home but

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

14

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

did not check every pay stub to verify. *Id.*at 220:13-222:7.

| | |
|---|---|
| Dumpit ¶ 9, 3:23–25 "No one at Best Buy has ever told me that I could not run incidental errands [in the company vehicle]" | Dumpit testified that he understood that any personal use, such as stopping to get something from the grocery, is against company policy and he knew he was in violation of BB policy when he performed these errands. PAE158, Dumpit 158:2–11. |

**RESPONSE:** Plaintiff blatantly mischaracterizes Dumpit's testimony. Dumpit testified that he asked his manager before going to Safeway with the BB vehicle. Dumpit Dep. 157:17-18. There is no testimony contradicting the declaration statement. Dumpit confirmed that he could make incidental errands and that he "asked his supervisor, because he knows better than me, that's why I ask him if, you know, because I have no idea that if we are allowed or not, that's why I ask him for his permission so yeah, that's the reason I ask him. . . . ***But he told me that I can so I did.***" *Id.* at 257:6-258:13.

| Sansone Hang | |
|---|---|
| **Declaration** | **Alleged Contradicting Evidence** |
| Hang Dec ¶ 6, 2:16–19 [contends to have been paid while driving home] | Hang was employed during the same time frame that the violative policies refusing to pay for drive time were in existence but still claims – without explanation – that non–violative policies exist. |

**RESPONSE:** Plaintiff cites nothing but his own argument to dispute Hang's testimony.

| | |
|---|---|
| Hang Dec ¶ 7, 2:22 "I have never worked off the clock" | PAE187–188, Hang 58:11–59:21 Admitted to working off the clock and through his meal breaks. |

**RESPONSE:** The cited testimony says nothing about off-the-clock work. Rather, in the cited testimony, Hang said sometimes he drives while eating. He further testified, "I mean, I do take my, -- I am taking my lunch, I mean, even though I'm driving. I don't know. To me, that considered a lunch for me. I'm just eating and driving, you know, I don't feel like I'm still working when I do that. Like I said, whenever I'm in the car, it feels like it's my break." Hang Dep., 63:16-24  He confirmed that he never performed any work before clocking in or after clocking out each day. *Id.* at 71:15-72:11.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

15

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

| Lo Heng Hui | |
| --- | --- |
| **Declaration** | **Alleged Contradicting Evidence** |
| Hui Dec ¶ 6, 2:12–13 [prep tasks take 30–45 minutes] | Hui testified that this statement was false. PAE 244, Hui 206:16–207. |
| **RESPONSE:**  Hui testified that the challenged declaration statement was accurate.  Hui Dep. 174:14-175:18.  Hui testified that it "roughly" takes him 30 to 45 minutes to complete his prep tasks, and that sometimes it takes longer.  *Id.* at 204:15-206:14.  Hui confirmed that the amount of time it took to complete prep work varied.  *Id.* at 204:16-2-6:14; 211:5-7 | |
| Hui Dec ¶ 8, 2:25-26 "The policy for meal breaks at Best Buy requires me to take my 30-minute meal break between noon and 12:30 so that I start it before the fifth hour of work." | Hui testified this was not Best Buy actual policy. PAE235, Hui 101:7–17 |
| **RESPONSE:**  The cited testimony says nothing about BB policy.  In fact, Hui confirmed that he took his meal breaks.  Hui Dep. 183: 17-25.  Indeed, he sometimes interrupts work orders to take a meal break.  *Id.* at 113:9-21 | |
| Hui Dec ¶ 8 3:1 "I never perform any work during the meal break." | Hui testified that this statement was false. PAE240–241, Hui 201:21–202:19 |
| **RESPONSE:**  Hui testified that the challenged statement was true, and that he took meal breaks.  Hui Dep. 183: 17-25.  Further, Hui testified as follows: Q.  What is your definition of a lunch break?  A.  It's the time that I'm supposed to rest and eat my lunch.  Q.  You're supposed to do it or are you actually doing it?  A.  I'm actually doing it . . Q. Do you ever eat in your van?  A:  Yes.  Q:  Do you ever eat while you drive . . .?  A:  No.  *Id.* at 80:15-81:14. | |
| Hui Dec ¶ 9, 3:7–10 [allowed an able to take rest breaks] | PAE223–224, PAE 242, Hui 77:7–78:23, 203:10–16 ;  PAE220–221, Hui 72:20–73:14. |
| **RESPONSE:**  The cited testimony is that Hui keeps his phone on during rest breaks.  He can, however, decline to answer phone calls when he is on his breaks.  185:7-13. | |
| Hui Dec 4:3–4 "I have read this Statement and declare that it is true and correct under penalty of perjury" | PAE242–243, Hui 203:18–204: |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

16

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

**RESPONSE:** Hui agreed with counsel's leading characterization of his declaration after hours of harassment and threats. Notwithstanding this mistreatment, Hui continued to assert that he did not work off the clock. Hui Dep. 209:20-210:24

| William Peterson | |
|---|---|
| **Declaration** | **Alleged Contradicting Evidence** |
| Peterson Dec. ¶ 1–11 | PAE339–340, Peterson 144:15–145:12 |

**RESPONSE:** Peterson did not testify that his declaration was incorrect. Conveniently omitted from the cited testimony is the following:

> Q: I'm asking you, based on what you looked at today, with that information, which has now refreshed your recollection, would you agree that that statement is not correct?
> THE WITNESS: I guess that's all relative to perspective. The way I meant all of this, the way I meant it is that I've never been forced into working without getting paid. So if you look at it with that perspective, then it's accurate, but technically it's not because the earlier days I was there, there's a half-hour commute time deducted.

Peterson Dep., 144:1-12 (objections omitted). Peterson's sole so-called admission was his recollection that there was a short period of his employment during which he was not paid for thirty minutes of commute time.

| Peterson Dec. ¶ 4 [accurately records meal breaks] | PAE322–323, PAE331–332, PAE335–336, Peterson 21:11–22:6, 113:20–114:11, 121:16–122:21 |
|---|---|

**RESPONSE:** Peterson testified "I do not work for 30 minutes (Peterson Dep., 32:7-8) and "I can tell you that I'm not going to work on a break and, you know, short myself" (*Id.* at 32:14-15). Nowhere does the cited testimony suggest that Peterson spent part of his meal break driving. In the cited testimony at 113-114, Peterson explained that his meal was accurate, and he may have misrecorded the when he arrived at or left a customer: "I did not shorten my lunch. I never do that . . . I would have just done a time on one of the calls on either end, just approximate." *Id.* at 114:15-114:21. Similarly, at pages 121–122, Peterson explained that he approximated when he arrived and left a customer, not that the recorded meal was inaccurate. Further, he testified that his route sheets are accurate "as far as starting and ending my day and taking any breaks, there accurate as far as that goes . . . more or less

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

17

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

the times on the service calls are going to be estimates, most of the time." *Id.* at 41:18-42:9.

| | |
|---|---|
| Peterson Dec. ¶10, 4:3–4 "I have always taken my meal breaks." | PAE324, Peterson 32:17–20; PAE322–323, PAE331–332, PAE335–336, Peterson 21:11–22:6, 113:20–114:11, 121:16–122:21 |

**RESPONSE:** Peterson took his meal breaks: "I do not work for 30 minutes (32:7-8) and "I can tell you that I'm not going to work on a break and, you know, short myself" (32:14-15). He testified that he could not remember if he'd ever taken a 29-minute meal break versus a 30-minute meal break. *Id.* at 32:17-20. Nowhere does he say that he spent part of his meal break driving. Plaintiff's characterization of Peterson's testimony is pure fiction.

| | |
|---|---|
| Peterson Dec. ¶ 11 [BB policy is to allow rest breaks] | PAE325–326, Peterson 38:17–39:21 |

**RESPONSE:** Peterson testified he did not take rest breaks because "I don't need them. I know we don't have to by law." 38:17-21. His choice to decline meal breaks in no way negates BB's policy to authorize and permit meal breaks.

### Jose Jesus Soto

| Declaration | Alleged Contradicting Evidence |
|---|---|
| Soto ¶ 2 [stating that he understood his rights and how they applied to the present lawsuit] | PAE384–386, Soto 161:16–163:1 |

**RESPONSE:** Soto confirmed that he understood that being interviewed and signing the statement was voluntary and that he understood that he could be limiting his rights by signing the statement. Soto Dep. 181:2-182:11, 186:17-187:8. He confirmed that he was not coerced or threatened to provide the statement and that the he was told that he did not need to be interviewed and could refuse to sign or provide a statement. *Id.* at 1852-186:4.

| | |
|---|---|
| Soto ¶ 6, 2:13–14 "I do not perform any work after I am clocked out." | PAE349–350, Soto 35:25–36:25 [he readily admits working off-the-clock.] |

**RESPONSE:** Soto confirmed that his declaration statement was true. Soto Dep. 192:20-25. He testified, "I didn't do any work [after he clocked out], I might have waited around, you know, for – order a part afterwards, but not work." Soto Dep. 199:22-200:6. He testified that he never let a manager know that he did any work after he clocked out. *Id.* at 200:7-19.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

18

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

| | |
|---|---|
| Soto ¶ 7, "I have always accurately recorded the amount of time that I work and the time I took my meal breaks on both TLC and my route sheets." | PAE356, Soto 57:1–10 |

**RESPONSE:** The cited testimony has nothing to do with clocking in and out.

| | |
|---|---|
| Soto ¶ 7, 2:24–25, "I believe I have been compensated for all of the time I have worked" | PAE388, Soto 174:6–13 |

**RESPONSE:** Soto testified that after he clocked out, he "might have waited around, you know, for – order a part afterwards, but not work." Soto Dep. 200:4-6. He never let his manager know. *Id.* at 202:21-203:7. Soto thought he had been paid for all time worked (Soto 201:11-23), but that if the occasional time after work that no one knew about was compensable work, he had not been paid for it. *Id.*

| | |
|---|---|
| Soto ¶ 9, 3:7 "I always take the full 30 minutes for my meal break." | Soto testified that there were discrepancies on his route sheets which did not always record the drive time before and after his lunch break. PAE373–375, PAE380, Soto 118:21– 119:16, 120:13–15, 152:12–25. |

**RESPONSE:** The cited testimony is that Soto made a mistake on recording times he started and ended a job on *one* route sheet. Soto Dep.152:22-25. On the day of the route sheet at issue, Soto took his meal break during the time that he recorded it. *Id.* at 212:17-213:10.

| | |
|---|---|
| Soto ¶ 10, 3:15–16, "I do not drive to my next appointment or perform any other type of work during my meal break." | See above. |

**RESPONSE:** The cited testimony is that Soto made a mistake on recording job times on one route sheet. Soto Dep. 152:22-25. Moreover, Soto did not drive anywhere during the day in question – he spent the entire day at a BB store fixing things. *Id.* at 212:17-29.

| | |
|---|---|
| Soto ¶ 10 3:9–11, "I do not answer calls to my work telephone or review emails during my meal break. If I receive a call, I let it go to voicemail and then I listen to my messages when my beak is over." | Soto admitted that the cited portion of his declaration is inaccurate, and that he answers calls during meal breaks. PAE392, Soto 236:17–23 |

**RESPONSE:** When confronted with a hypothetical that a customer might call during a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

19

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

break and he might answer, Soto agreed that if he had answered, his statement would not be true. He did not testify that he, in fact, answered. Soto Dec. 236:17-23. Soto confirmed that he always takes a 30-minutes meal break. Soto Dec. 207:12-17. He confirmed his statement that "I do not answer calls to my work telephone during my meal break" was true. *Id.* at 208:1-5. He testified that if he receives a work call during a meal break, "I don't answer the phone. I let it go to voice mail." *Id.* at 208:6-9.

| Soto ¶ 12 3:26–27, "I do not perform any work during my rest breaks." | PAE392, Soto 236:9–16 |

**RESPONSE:** Soto did not say that he worked during his rest breaks. He said that it was possible that he might have answered a phone call during a break. He further testified that the statement, "I do not perform any work during my rest breaks" is true. Soto Dep. 212:1-6.

| **Richard Lloyd Telles** | |
| **Declaration** | **Contradicting Evidence** |
| Telles Dec. ¶ 2 | PAE433–436, Telles 43:5–46:17 |

**RESPONSE:** Mr. Telles could not remember all of the details of his meeting with BB's attorneys because "[u]nfortunately, my memory hasn't been in my later years … as good as it was in my earlier years." Telles Dep. 222:8-10. BB's attorneys told Telles that he was being interviewed in connection with a lawsuit that had been brought against the company by Tim Campbell and he knew his rights. *Id.* at 43:7-9, 235:15-236:14. After this initial interview, Telles met with one of BB's attorneys in Chino, CA and read the statement. BB's attorney asked him to review it for accuracy, make any changes that needed to be made, and if all of the statements were accurate and true to the best of his knowledge, sign the statement under penalty of perjury. *Id.* at 49:24-52:13.

| Telles Dec. ¶ 4, 2;3–4 "I believe that I have been paid overtime for of the overtime hours that I have worked." | Telles admitted that this statement is inaccurate and he regularly performs work off-the-clock. PAE460–463, Telles 225:6–12; 226:11–227:6, 227:24–228:7 |

**RESPONSE:** Telles did not testify that he "regularly" performs work off-the-clock; he stated that he answers phone calls or reads emails "on occasion." Telles Dep. 228:3. Telles

Morgan, Lewis & Bockius LLP
Attorneys At Law
Irvine

DB2/ 24304600.1

20

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

testified that neither BB nor his job duties demanded such work. *Id.* at 265:13-18. Telles explained that BB had previously told him that he was not permitted to work off-the-clock: "[a]gain, because I know the rules that they ask. I know that I'm supposed to, but I do this because this is just the way I work. This is just me. Best Buy has never, ever told me I can work off the clock. They've told me I cannot." *Id.* at 266:12-19.

| Telles Dec. ¶ 7, 2:22–23 "I always accurately record the time at which I start and stop working for the day and the time at which I take my meal breaks." | PAE458–459, PAE452, Telles 216:2–217:5,175:20–25; PAE462, 227:3–6 |
|---|---|

**RESPONSE**: Telles never testified that he "often" continues working after clocking out. He stated that "on occasion" he answers phone calls and/or reads emails after clocking out. Telles Dep. 227:4-228:3. BB never required him to do so, was not aware that he had done so, and had specifically instructed him not to work off-the-clock. *Id.* at 266:12-19.

| Telles Dec. ¶ 9, 3:6-7 "Best Buy employees are not allowed to perform work when they are not clocked in. This rule was explained to me when I was hired and is constantly reinforced by management… my supervisors have always been very adamant that they do not want me to work off the clock." | Telles testified that much of his off-the clock work was directly caused by his supervisors and that Best Buy knew or should have known he was working off-the- clock due to his route sheets. PAE462, Telles 227:3–6; Exhibit 3 to Telles Deposition; PAE455, Telles 186:5–10; PAE464, 230:20–25; PAE465, id. 267:14–19 |
|---|---|

**RESPONSE:** Telles never stated that supervisors caused or knew of off-the-clock work. Rather, Telles simply acknowledged that he has spoken to his supervisor after clocking out for work before. Telles Dep. 227:3-6. He never made any representations that his supervisor <u>caused</u> him to work off-the-clock or knew he was off-the-clock. Quite the contrary, BB instructed Telles not to perform work off-the-clock. *Id.* at 266:16-19. Further, when asked whether Best Buy knew he had worked off-the-clock, Telles responded, "No." *Id.* at 265:25-266:6. Telles explained he could have taken a full meal even when his call times and meal periods overlapped, because while at the house, he could have clocked out, taken a meal break, and then clocked back in for work. *Id.* at 182:19-24; 244:21-245:12.

| Telles Dec.¶ 10, 3:20–23, "I always | Telles admitted that the Declaration is inaccurate |
|---|---|

| take the full 30 minutes for my meal break… I do not drive to my next appointment while I am still on my meal break." | and he regularly drove during his meal breaks. PAE457, PAE441–443, PAE451–453, PAE454, Telles 215:12–17, 149:9–151:19, 172:1–11, 174:5–176:4, 183:3–21; Exhibit 3–4 attached to Telles Exhibit 3 to Telles Deposition; PAE455, Telles 186:5–10  PAE444, Telles 152:18–23. |

**RESPONSE**:  Telles did not testify that he regularly drives during his meal; he estimate that he has done so a dozen times in the last couple of years. Telles Dep. 172:1-16.   Telles also stated that it is possible he might drive to his next customer, but he does not do so all the time.   If he drives to another customer, it is because he chose to do so – no one ever asked it of him.  *Id.*  He spends his meal break doing a number of activities, including reading the paper and making phone calls – some of which are to his wife.  *Id.* at 150:1-12. BB has always made breaks available to him and that he has always received the opportunity to take a 30-minute, uninterrupted lunch break.  *Id.*  240:13-241-7.

| Telles Dec.¶ 11 3:26–27, "I have always accurately reported the time that I took my meal breaks." | Telles expressly recanted this portion of his declaration (PAE458, Telles 216:2– 217:5) and admitted that he falsifies his meal break start and end times to give the appearance of a full 30–minute break. PAE452, Telles 175:20–25 |

**RESPONSE:**  Telles testified that BB has always made meal breaks available, that he always had the opportunity to take them (*id.* at 240:21-241-7), and that if he did not take a meal, it was because he chose not to.  *Id.*  On those occasions where he skipped a meal, he would not tell BB.  *Id.* at 241:9-14.  Further, Telles said that he has driven from one place to another during a recorded meal break no more than a dozen times.  *Id.* at 172:1-16.

| **Ken Van Tran** | |
|---|---|
| **Declaration** | **Contradicting Evidence** |
| K. Tran Dec. ¶ 1–12 | PAE505, K. Tran 133:2–22 |

**RESPONSE:**  After hours of harassing, Tran agreed with a leading question that some portions of his statement might not be true.  Actually, however, Tran confirmed that all of the following were true:  He takes 30 meal breaks nearly every day, he only drives during breaks of his own choosing because he is not hungry or wants to end his route early, and he

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1                22                OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

| has not informed his supervisors that he drives during breaks (76:3-25, 114:7-116:7, 163:25-165:12);  Techs are repeatedly reminded by human resources and supervisors to take lunch (79:8-80:1); he does not answer calls from his supervisors while on lunch or break (77:16-23, 155:2-156:9); he does not work before clocking in at the start of the day or after the end of the day (145:15-147:12); and he reports overtime if he works overtime (73:23-74:3). | |
|---|---|
| K. Tran Dec. ¶ 2 | PAE506–508, K. Tran 136:1–138:18 |
| **RESPONSE:**  The BB attorney read Tran his statement, and he could have made changes. He could have read the declaration over again before signing it.  The BB attorney told him about the lawsuit but he cannot recall what.  K. Tran Dep. 137:12-140:2, 166:16-172:14. | |
| K. Tran Dec. ¶ 10 3:6–9 "I am required to take an uninterrupted meal break for at least thirty minutes around four-and-a-half hours into my shift. . . | K. Tran testified that he understood the meal break policy to mean that whenever he is eating, but does not exclude him from working during this time. PAE495, K. Tran 75:4–25, PAE497– 504, K. Tran 112:21–114:5, 117:22– 121:8. |
| **RESPONSE:**  Tran testified that on rare occasions such as when he or one of his children have a doctor's appointment would he drive while eating lunch to finish early. He also said that there was a period of time when he was choosing to drive during his lunch because he was not hungry and his supervisor instructed him that he could ***not*** drive during lunch time and had to take a half hour lunch.  Tran Dep. 76:3-25; 114:7-116:7; 122:23-128:22 | |

| **David Zook** | |
|---|---|
| **Declaration** | **Alleged Contradicting Evidence** |
| Zook Dec. ¶ 2 | Zook testified that he did not understand the meaning or significance of this document. PAE535, Zook 46:2–16. |
| **RESPONSE:**  Zook testified that he knew that the statement was going to be used on BB's behalf in the lawsuit, (Zook Dep. 48:4-11), that the BB attorney told him the case was a class action (*id.* at 203:25-206:1), that the BB attorney read the whole statement through to him over the phone and gave him an opportunity to make corrections, and that he read the declaration again when it was mailed to him before he signed it.  *Id.* at 87:10-90:7. | |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1

23

OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)

| Zook Dec. ¶ 4 "My workday begins at 7:00 a.m." | In his deposition, Zook contradicted the statements in his declaration, stating that he started at 6:50 a.m., (not 7:00 a.m. as written in the statement). PAE551, Zook 147:15–25. Zook testified that he needed to begin his day five minutes early to insure he had enough time to prepare his route. PAE543, *Id.* 75:2–6. |

**RESPONSE:**  Zook did not say that he started at 6:50.  He said that he usually turned on his laptop at 6:50 and then makes coffee.  He clocks in to TLC at 6:55 confirming that the five minutes "early" were paid (BB pays an extra 5 minutes for log-in).  Zook Dep. 147:10-148:5

| Zook Dec. ¶ 5 [not required to answer calls during breaks] | PAE533–534, Zook 31:14–20, 32:10–18 [required to keep phone on throughout working hours.] |

**RESPONSE:**  The cited testimony and declaration do not conflict.  Mr. Zook was not required to answer calls while on breaks, and he confirms that BB supervisors instructed him not to answer phones while off the clock.  Zook Dep. 156:21-157:2.

| Zook Dec. ¶ 6, 2:18–19 "My meal break always lasts 45 minutes and I spend the entire time ether eating or reading the news on my phone." | Zook testified that not only is this statement false, he specifically told the attorney taking his declaration that he regularly did not take meal breaks. PAE536, 54:10–24 |

**RESPONSE:**  Zook's declaration states that he takes 45 minute meal;  *it does not state that he took them at the time he recorded them on his route sheets.*  Zook testified that until recently, he always took 45 minute lunch breaks, but more recently he has taken 35 minutes. He confirmed that he eats and reads the news during those breaks.  Zook Dep. 74:21-24, 144:20-24, 164-20-166:15.  The fact that he may not take meals at the exact time that he records them on his route sheets contradicts nothing in his declaration.

| Zook Dec. ¶ 7 | Zook testified that Best Buy often prevents him from being able to take a rest break. PAE553–555, Zook 191:19–21, 192:15–23, 196:9–; PAE539, Zook 57:6–10 |

**RESPONSE:**  Consistent with his declaration, Zook testified that he took 4-6 five minute smoke breaks a day and that he could take a 10 minute rest breaks in the morning and afternoon if he wanted to.  Zook Dep. 191:15-18, 206:3-25. He further said that about once every two to three months he might adjust the times of his breaks in light of his work, but he

DB2/ 24304600.1
MORGAN, LEWIS & BOCKIUS LLP  ATTORNEYS AT LAW  IRVINE

| | |
|---|---|
| would not skip them altogether. *Id.* at 192:16-193:19 | |
| Zook Dec. ¶ 10 | Zook expressly noted that this statement was false and not what he told the attorney. PAE536, PAE538, Zook 54:10–24, 56:17– 22 |

**RESPONSE:**  Zook's declaration states that "the specific time that I record on the route sheet for my lunch breaks is accurate about 95% of the time.  The only reason that time would not be accurate would be because I took an earlier lunch than usual . . "  Consist with his declaration, Zook testified that his route sheets are accurate except that he sometime takes lunch at a different time and that he may not record the time that he spends at the UPS store perfectly.  Zook Dep. 154:15-156:6.  Zook provided no testimony indicating that his TLC records (the records from which he is paid) are inaccurate.

| | |
|---|---|
| Zook Dec. ¶ 11 | PAE551–552, Zook 147:15–25, 150:4–10 |

**RESPONSE:**  Mr. Zook did not testify that he works on his laptop before clocking in.  Instead, he testified that he ***clocks into TLC*** at 6:55 and begins working at that time.  He is not working off the clock.  When route sheets were used for pay purposes, he put 6:55 on the route sheets when he started time worked. Zook Dep. 147:24-148:5, 150:20-152:20.

| | |
|---|---|
| Zook Dec. ¶ 11, 4:8–9 "[prior to 2010] my manager around that time, John Saad, made sure that I was paid for the time that I spent driving home at the end of my shift." | Zook testified that this statement is false. PAE542, PAE544–PAE546, Zook 62:16–25, 81:5–82:14, 84:12–23. |

**RESPONSE:**  Zook testified that he was always was paid for his drive time home, and he verified every pay stub to confirm that he was paid for such drive time prior to 2010. Zook Dep. 64:13-67:7. His declaration states, consistently with his deposition testimony, that his manager made sure he was paid for his drive time home.

Dated:  August 19, 2013                    MORGAN, LEWIS & BOCKIUS LLP


                                        By:    /s/ Barbara J. Miller
                                               Barbara J. Miller

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 24304600.1                    25                    OPPOSITION TO MOTION TO STRIKE
CASE NO. CV-12-07794 JAK (SH)